IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

STACEY BROWN,

      Plaintiff,

v.

CLAYTON COUNTY, GA *ex rel.*
Clayton County Police Department, Ga;
KEVIN ROBERTS, in his official and
individual capacity; WILLIAM
IBARRONDO, in his official and
individual capacity; ANTHONY
THURMAN, in his official and
individual capacity,

      Defendants.

CIVIL ACTION FILE NO.
1:21-cv-00723-LMM-LTW

## MAGISTRATE JUDGE'S ORDER AND
## FINAL REPORT AND RECOMMENDATION

This case is before the Court on a Motion for Summary Judgment ([Doc. 56]) filed by Defendants and a Motion for Leave to Cure ([Doc. 64]) filled by Plaintiff. For the reasons provided below, Plaintiff's Motion for Leave to Cure is **GRANTED in part and DENIED in part**, and the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED in part and DENIED in part**.

## **PRELIMINARY ISSUES**

Before turning to the factual background, the undersigned must decide what facts are properly before the Court. The Local Rules and the Scheduling Order are clear about the procedures for summary judgment motions. The party moving for summary judgment provides a statement of material facts. [Doc. 20 at 6]; N.D. Ga. Loc. R. 56.1B. "The non-moving party shall file a response to the moving party's statement of material facts . . . ." [Doc. 20 at 6–7]; see also N.D. Ga. Loc. R. 56.1B(2)(a). And the non-movant is also to file their own "separate statement of material facts." N.D. Ga. Loc. R. 56.1B(2)(2); see also [Doc. 20 at 7]. Plaintiff's counsel failed to comply with either of these requirements for non-movants. [Doc. 61]. After Defendants pointed out the issue in their reply, Plaintiff filed the Motion for Leave to Cure. [Doc. 62 at 1–3]; [Doc. 64].

Plaintiff's motion to cure is three motions. First, Plaintiff seeks to file his statement of additional facts as a separate document, as opposed to including it "within his response brief." [Doc. 64-1 at 1]; see also [Doc. 64-2]. Second (and for the first time), Plaintiff seeks to file "a response to Defendants' statement of facts." [Doc. 64-1 at 1–2]; [Doc. 64-3]. And third, Plaintiff tries to file a sur-reply to bolster his argument "that [D]efendants may not enjoy qualified immunity where they violate an established statutory or constitutional rights [*sic*]." [Doc. 64-1 at 3–15]. Plaintiff's

counsel provides no explanation for why he failed to comply with the Local Rules and the Scheduling Order other than a vague suggestion that he acted "inadvertently." [Doc. 64-1 at 1–3]; [Doc. 67].

Even a *pro se* party is expected to comply with the Court's procedural rules. Loren v. Sasser, 309 F.3d 1296, 1304 (11th Cir. 2002). And Plaintiff is not *pro se*; he is represented by a licensed attorney with more than a decade of experience who has appeared in this Court on numerous occasions. Unfortunately, Plaintiff's counsel proffered no reason for ignoring the clear instructions in the Local Rules and the Court's Scheduling Order. Still, as Plaintiff notes, the Federal Rules of Civil Procedure provide that the Court *may* "give an opportunity to properly support or address [a] fact" after a "party fails to properly" do so in the first instance. Fed. R. Civ. P. 56(e)(1). "In many circumstances this opportunity will be the court's preferred first step." Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendment, *Subdivision(e)*.

As mentioned above, Plaintiff's motion is really three motions. Plaintiff initially filed his statement of additional facts "within his response" and now seeks to file it as a separate document. [Doc. 64-1 at 1]; [Doc. 64-2]. Defendants cannot seriously argue that they are prejudiced by the Court considering those facts because they had the opportunity to respond. [Doc. 63]. That is a proper use of Rule 56(e)(1), and thus Plaintiff's Motion to Leave for Cure is **GRANTED** to the extent he seeks to correct a

3

mere technical deficiency by setting forth his statement of material facts in a separate document.  Compare [Doc. 64-2] with [Doc. 61 at 5–10]. But Plaintiff's other two requests stretch Rule 56(e)(1) too far.

In asking to file a response to Defendants' statement of material facts, Plaintiff is not just correcting a "technical error," like he suggests.  See [Doc. 64-1 at 2–3]. Plaintiff completely failed to file any response to Defendants' statement of material facts the first go-round.  [Doc. 61].  Thus, Plaintiff's request is, in effect, an attempt to respond to Defendants' statement of material facts approximately four weeks after his deadline.  Filing deadlines "may be modified only 'upon a showing of good cause.'" Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (quoting Fed. R. Civ. P. 16(b)).  "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'"  Sosa, 133 F.3d at 1418 (quoting Fed. R. Civ. P. 16 advisory committee's note).

Defendant points out this issue in its response ([Doc. 65 at 5]), and Plaintiff never makes any effort to show "good cause."  See [Doc. 64-1]; [Doc. 67].  As mentioned above, all Plaintiff's counsel does is vaguely suggest that he "inadvertently did not include . . . a response to Defendants' statement of facts."  [Doc. 64-1 at 1–2].  That is not "good cause."  See Harper v. M/V Ouro do Brasil, No. 8:12-CV-1976-T-23TGW, 2013 WL 12388568, at *7 (M.D. Fla. July 10, 2013) (holding that "the plaintiff's lack

of reasonable diligence and attorney error . . . are the antithesis of good cause"); In re Pearlman, No. 6:07-BK-00761-KSJ, 2011 WL 1395296, at *1 (Bankr. M.D. Fla. Apr. 7, 2011) ("Attorney error or inadvertence does not constitute good cause . . . ."). Plaintiff's Motion for Leave to Cure is **DENIED** to the extent he seeks to now file an improperly-long[1] and out-of-time response to Defendants' statement of material facts.

Last, Plaintiff's Motion for Leave to Cure contains an embedded sur-reply. [Doc. 64-1 at 3–15]. Plaintiff argues "he has not filed a sur-reply" but simultaneously acknowledges that he made "new arguments . . . to address" Defendants' reply brief. [Doc. 67 at 6]. That is a sur-reply. Plaintiff also asserts that "only the proposed statements of additional facts and objections to Defendants' statements of material fact were necessary," and thus it is unclear why the vast majority of his Motion for Leave to Cure has nothing to do with those filings. See [id.]; see also [Doc. 64-1 at 3–15]. In any event, the point is moot.

Plaintiff wants "to address and clarify issues raised by about [*sic*] Rule 11 sanctions." [Doc. 67 at 6]. "A motion for sanctions [under Rule 11] must be made

---

[1] As Defendants correctly note, Plaintiff's proposed response is 64 pages—more than twice the length permitted by the Scheduling Order. [Doc. 65 at 7–8]. In reply, Plaintiff asserts, for the first time, that "there was no practical way" for him to respond "without a substantial number of pages." [Doc. 67 at 4]. There is no need to address this new argument because Plaintiff never requested permission to file a response in excess of the Court's page limit. See [Doc. 64-1].

separately from any other motion . . . ." Fed. R. Civ. P. 11(c)(2).  Defendants did not make a separate motion for Rule 11 sanctions; they simply "request the Court to issue an order under [Rule 11] requiring Plaintiff and his lawyer to show cause why sanctions . . . should not be imposed." [Doc. 67 at 15].[2]  Because there is no proper request for Rule 11 sanctions before the Court, there is nothing for Plaintiff to (sur)reply to. Therefore, to the extent Plaintiff's Motion for Leave to Cure is an unstated request for leave to file sur-reply, it is **DENIED**.

While Plaintiff's Statement of Additional Facts is now a "separate statement," that does not mean it otherwise complies with the Scheduling Order or the Local Rules. Plaintiff's frequent use of "<u>Id.</u>" makes it difficult to even tell what evidence is supposed to supports his facts.  <u>See</u> [Doc. 64-2 ¶¶2–8, 10–11, 17, 19, 21, 22–23, 27–28, 30]. "<u>Id.</u>" refers to "the immediately preceding authority" and as such is to be used "*only when the immediately preceding citation contains only one authority.*" THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R.4.1, at 79 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) (emphasis in original); <u>see also</u> <u>id.</u> at 80 ("'*Id.*' may not be used to refer to one authority in a proceeding footnote if the preceding footnote

---

[2] The subsection of Rule 11 that Defendants cite is titled "***On the Court's Initiative.***" Fed. R. Civ. P. 11(c)(3). Doing something at the request of the parties is not the Court acting "[o]n its own" initiative, as that provision contemplates. <u>See</u> <u>id.</u>

cites more than one source.").  The Court does not expect Bluebook perfection, but when "Id." follows a citation to multiple authorities, it is impossible to tell which authority is being cited.  The Court will not guess at what authority Plaintiff thinks supports Paragraphs 10, 11, and 17.  Those facts will not be considered since they are not supported by a proper citation to evidence.  See N.D. Ga. Loc. R. 56.1B(1); see also id. 56.1B(2)(b) (providing that the "statement of additional facts" must also "meet the requirements set out in LR 56.1B(1)").

As best the Court can tell, half of Plaintiff's purported facts are supported by nothing but a general citation to his affidavit with no reference to any page or paragraph number.  [Doc. 64-2 ¶¶1–8, 15, 18–19, 24–25, 27–28, 32].  The Local Rules provide that the Court "will not consider any fact" unless it is "supported by a citation to evidence (**including page or paragraph number**)." N.D. Ga. Loc. R. 56.1B(1) (emphasis added).  Also, the Scheduling Order provides that citations in support of the parties' facts "must identify the specific location of the evidence, such as a page number in an exhibit, **the paragraph number in an affidavit**, the pages and lines in a deposition, or the start and stop time in a recording."  [Doc. 20 at 6] (emphasis added).  Because Plaintiff's general citations to his affidavit violate both the Scheduling Order and the Local Rules, the Court will not consider those purported facts either.

The Court will also not consider, for example, Plaintiff's general citation to "Exhibits B through E" in support of Paragraph 14. [Doc. 64-2 ¶14]. Those exhibits total more than 125 pages. [Doc. 61-2, 61-3, 61-4, 61-5]. The Court cannot be expected to "dig through volumes of documents and transcripts" to try to find facts to support Plaintiff's position. See Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011).[3] Last, Plaintiff's Paragraph 26 is not supported by a citation to *anything* and thus is not properly before the Court. [Doc. 64-2 ¶26]. With those preliminary issues out of the way, the Court turns to the factual background of this case—to the extent the parties' statements of fact are properly supported.

## **FACTUAL BACKGROUND**

This factual background is based on the parties' statements of material facts to the extent such facts are undisputed. To the extent the parties' statements of material facts are disputed,[4] the Court draws on the record itself. The Court has reviewed the

---

[3] Defendants occasionally make general citations to exhibits like Exhibits 8 and 10 of Plaintiff's deposition or Exhibits A and B of a declaration. See, e.g., [Doc. 56-13 ¶¶29, 31, 33]. But those exhibits are one-page emails and thus Defendants' citations are the functional equivalent of a citation to a specific page number. See [Doc. 57-1 at 576, 578]; [Doc. 56-12 at 8–9].

[4] Because Plaintiff failed to timely respond to Defendants' Statement of Material Facts, as discussed above, they are deemed admitted. [Doc. 20 at 7]; N.D. Ga. Loc. R. 56.1B(2)(a).

evidence and has viewed all evidence and made all factual inferences in the light most favorable to Plaintiff.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Plaintiff was "a law enforcement officer for more than 25 years" and worked for Defendant Clayton County Police Department ("CCPD") for "nearly 10 years. [Doc. 63 ¶30]; see also [Doc. 56-13 ¶1].  The other defendants are individuals who work for CCPD (collectively, "the Individual Defendants").  During the relevant time, Defendant Jeffery Owensby was a Lieutenant ([Doc. 56-13 ¶11]), Defendant William Ibarrondo was a Captain ([Id. ¶12]), and Defendant Anthony Thuman was a Major ([Id. ¶13]).  Defendant Kevin Roberts is the Chief of Police.  [Id. ¶14].  At some point, some unspecified person called Plaintiff "a go-to guy or a go-to detective."  See [Doc. 63 ¶31]; see also [Doc. 61-5 at 42:22–44:16].  From 2016 on, Plaintiff voiced concerns about his caseload and made requests to lighten his workload.  [Doc. 56-13 ¶15].[5] These complaints/requests occurred while Plaintiff was on duty and concerned issues arising out of his employment with the CCPD.  [Id. ¶16].

---

[5] Plaintiff claims that he told Defendants their actions violated certain civil service rules, but the only evidence he cites are the rules themselves and a general citation to his affidavit.  [Doc. 64-2 ¶9].  As discussed above, the Court will not consider a general citation to an affidavit that does not include page or paragraph numbers, and the Civil Service Rules do not show who Plaintiff allegedly complained to or when he did so.  See [Doc. 57-1 at 471–72].

Lindsay Marchant works for the Georgia Bureau of Investigation ("GBI") as the Assistant Special Agent in Charge of the Internet Crimes Against Children ("ICAC") task force.  [Id. ¶20].  The GBI forwards information related to child pornography, child sex trafficking, and child enticement to affiliated agencies like CCPD in the form of a "cybertip" via the ICAC Data System ("IDS").  [Id. ¶22]; see also [id. ¶24]. Plaintiff was assigned to the ICAC task force.  [Id. ¶28].  On March 20, 2018, Agent Marchant sent Plaintiff an email asking if CCPD could receive cybertips again, since CCPD had previously refused to accept new cybertips cases because of a backlog.  [Id. ¶¶29–30].  Plaintiff responded that CCPD was able to begin receiving ICAC cases again.  [Id. ¶31].  Plaintiff testified that it was CCPD's responsibility to notify the GBI if it lacked resources to investigate cybertips in a timely manner.  [Doc. 57-1 at 56:21– 57:4].[6]

In early June 2019, Agent Marchant discovered approximately 30 unreviewed cybertips in Plaintiff's IDS account dating back to January 2019.  [Doc. 56-13 ¶32].

---

[6] Plaintiff argues that "neither Clayton County Police Department nor GBI nor the ICAC agreement provided a clear and specific directive on timing to submit CyberTips."  [Doc. 64-2 ¶23].  In support, Plaintiff cites "Id." and the two preceding footnotes are also "Id." meaning the immediately preceding authority is a "Significant Incident Log," which is discussed below.  [Id. ¶¶20–23].  As Defendants point out, the factual assertion in Plaintiff's Paragraph 23 "is not supported by the cited record evidence."  See [Doc. 63 ¶23]; see also [Doc. 61-6].

Agent Marchant emailed Plaintiff advising him of this issue, inquiring if his email alerts were still functioning, and asking "if we needed to help you out by assigning some of the cybertips to your counterparts at Clayton County." [Id. ¶33]. On August 23, 2019, Plaintiff sent Defendant Owensby 28 incident reports stemming from cybertips, each of which listed an incident date of "8/23/2019." [Id. ¶35]. Plaintiff admits he received those cybertips "well before" August 23, 2019. [Id. ¶36].

Three days later, Plaintiff notified human resources that he planned to take twelve weeks of leave under the Family and Medical Leave Act ("FMLA"). [Id. ¶¶45–46]. On the day Plaintiff began his FMLA leave, he sent Defendant Owensby an additional 27 incident reports pertaining to cybertips that he received prior to August 23, 2019. [Id. ¶38]. Because it was "unusual" to receive so many incident reports at a single time, Defendant Owensby believed the incident reports did not all come in on the dates Plaintiff indicates, and Defendant Owensby was concerned that the files had not been properly investigated. [Id. ¶42].

Defendant Owensby asked to open an internal affairs ("IA") investigation and was told to do so by Defendant Ibarrondo. [Id. ¶39]. Defendant Ibarrondo felt that CCPD needed to determine when the cybertips came in and how long it took Plaintiff to review and submit incident reports. [Id. ¶43]. On October 1, 2019, Defendant Owensby told Agent Marchant that he was conducting an internal investigation into

Plaintiff's conduct.   [Id. ¶50].   The next day, Defendant Owensby emailed Agent Marchant a list of cybertip numbers, asking when each cybertip was sent to Plaintiff and when Plaintiff downloaded the information.   [Id. ¶51].

Marchant responded providing exact dates and noting that "on many occasions [Plaintiff] would go in and view the [image or video in question] and not the report itself," which he would view "much later." [Doc. 56-12 at 12].  Marchant theorized that Plaintiff "was seeing how urgent the tip was based on the image/video files." [Id.]. It appears all the cybertips in question were assigned to Plaintiff at least seven months before "8/23/2019," with numerous tips being more than a year old.  [Id. at 13–14].[7] Marchant stated, "There are about 30+ reports from 2019 that [Plaintiff] has never even opened."   [Id. at 12].   Marchant wrote that she reached out to Plaintiff when she "noticed he had not logged into the cybertip portal in some months," and that was when Plaintiff finally said "he could no longer take on anymore cybertips" but that he "would handle his current cybertip case load." [Id.].

---

[7] The email states that two tips were assigned in May 2019 and that one was assigned in August 2019, but these appear to be obvious typographical errors since information pertaining to those tips was downloaded in 2018 and Plaintiff "stopped receiving cybertips on June 14, 2019." See [Doc. 56-12 at 13–14; see also [id. at 12]. One tip did not have an assignment date due to an apparent "glitch," but was "downloaded April 24, 2018." [Id. at 14].

Around the time he received Marchant's email, Defendant Owensby asked to open a formal IA file into Plaintiff's handling of the cybertips. [Doc. 56-13 ¶58]. That file contains a memo from Defendant Owensby stating that, in his opinion, Plaintiff had failed to follow up on cybertips in a timely manner. [Id. ¶60]. Plaintiff notes that Defendant Owensby's memo mentions a "Significant Incident Log" from earlier in 2019 that is not included in the IA file. [Doc. 63 ¶16]; [Doc. 57-1 at 678]. In April 2019, Defendant Owensby noted some missing information and numerous typographical errors in an incident report submitted by Plaintiff. See [Doc. 61-6 at 4–6]. In his response to the Significant Incident Log, Plaintiff claimed he "immediately corrected the document" and "placed a corrected copy of that report in one of the supervisor's boxes," though he could not "remember which [supervisor]." [Id. at 7]. Plaintiff further asserted that a "Sargent Thesis" later approached him asking "for the report because it was the only one missing" and that Plaintiff provided him with a copy of the report. [Id.]; see also [Doc. 63 ¶21].[8]

_____

[8] Plaintiff claims "Defendants Owensby and Ibarrondo knew that Plaintiff submitted" the incident report "to Lt. Sabria Hill" in a timely manner, citing the Significant Incident Log. [Doc. 64-2 ¶22]. But that document never mentions Lt. Hill and does not show any Defendant "knew" Plaintiff allegedly submitted the report to her. [Doc. 61-6 at 2–8]. Plaintiff allegedly told Defendant Owensby about giving a copy of the report to Sargent Thesis, but that was two months after the incident described in the report. See [id. at 6–7]; see also [Doc. 64-2 ¶21] (asserting that he "resubmitted" the incident report "to Sgt. Thesis on June 10, 2019").

CCPD's standard operating procedure provides officials with discretion in deciding whether to inform an accused person of an open IA investigation. [Doc. 56-13 ¶¶65–66]. Because Plaintiff was on FMLA leave at the time, Defendants decided not to disclose the investigation to Plaintiff until he returned. [Id. ¶68]. But before that could happen, Plaintiff informed Defendants that he would resign effective November 25, 2019—the last day of his FMLA leave. [Id. ¶83]. At the time of his resignation, Plaintiff had no knowledge of the IA investigation, and he admits that his resignation had nothing to do with the investigation. [Id. ¶¶82, 85]. Plaintiff would have been told about the investigation, asked to provide a statement, submit witnesses, "and the like, but this never occurred because Plaintiff voluntarily resigned." [Id. ¶74].

Since Plaintiff resigned before the IA investigation was completed, Defendant Roberts decided to close the file without any disposition, and Plaintiff did not receive any discipline because of the investigation. [Id. ¶¶76, 89]; see also [Doc. 57-1 at 580]. Any disciplinary recommendations would have been sent to CCPD's Conduct Review Board ("CRB"), which would have then made a recommendation to the Chief of Police who would have decided what discipline to impose. [Doc. 56-13 ¶¶77–78]. If an aggrieved employee disagrees with the decision of the Chief of Police, he can file an appeal to Clayton County's Civil Service Board. [Id. ¶79]. At hearings before the Civil Service Board, employees can be represented by counsel; can present, examine,

and cross-examine witnesses; and have all due process rights available under the Georgia Administrative Procedures Act.  [Id. ¶80].

Plaintiff notes that—nearly a full year after he voluntarily resigned—he filed a Grievance Form asserting that the statements in the IA file "are far from true" and asking the Civil Service Board to remove the IA file. [Doc. 63 ¶29]; see also [Doc. 61-7 at 4]. But the Grievance Form says that "the employee must present their grievance to their supervisor and Department Direct" and have the "Department Director sign this form indicating they have investigated this matter," which Plaintiff did not do. [Doc. 61-7 at 4]; see also [Doc. 57-1 at 481–82] (Clayton County Civil Service Rule 11.202 outlining the steps that must be followed before an employee can have a hearing before the Civil Service Board). As was explained to Plaintiff in response to the Grievance Form, the grievance system "is only available to active employees." [Doc. 61-7 at 2].

## **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party's burden at summary judgment depends on whether that "party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A defendant can discharge their burden by merely

"'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [a plaintiff's claims]." Id. at 325.  The plaintiff is then required to point to competent evidence of specific facts that create a genuine disputed issue for trial. Id. at 324.

In assessing whether a party is entitled to summary judgment, the Court views the evidence in the light most favorable to the nonmovant.  See Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003).  But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247–48 (emphasis in original).  A fact is material when it is identified as such by the controlling substantive law.  Id. at 248.  And an issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Id. at 249–50.

## LEGAL ANALYSIS

Plaintiff's first claim is for alleged FMLA retaliation.  [Doc. 6 ¶¶55–69].  And the last two counts assert Constitutional "due process" claims for alleged violations of 42 U.S.C. § 1983.  [Id. ¶¶125–62].  Plaintiff's other counts arise under Georgia state

law.  See [id. ¶¶70–124].[9]  The undersigned addresses each in turn.

## I.    Plaintiff's FMLA Retaliation Claim

As an initial matter, Defendants correctly note that the Individual Defendants cannot be liable under the FMLA in their individual capacity.[10]  [Doc. 56-1 at 12]; see also Wascura v. Carver, 169 F.3d 683, 687 (11th Cir. 1999) ("We hold that a public official sued in his or her individual capacity is not an 'employer' under the FMLA, and therefore there is no federal subject matter jurisdiction over such a claim.").  In response, Plaintiff argues he "may bring Claims against under [*sic*] State Constitutional Law." [Doc. 61 at 10–12].  Georgia's state constitution does not have anything to do with whether the Individual Defendants are "employer[s]" under the FMLA's statutory

---

[9] Defendants asserted that Count Five—Plaintiff's "Application for Writ of Mandamus"—also arises under § 1983. [Doc. 1 ¶6]; see also [Doc. 6 ¶¶116–24].  But Section 1983 does not provide for mandamus relief, and the parties agree the mandamus claim arises under Georgia state law.  See [Doc. 56 at 26–30]; [Doc. 61 at 25–27].  Two statutes authorize federal courts to issue writs of mandamus, but neither provide a basis for jurisdiction in this case.  See 28 U.S.C. § 1361 (providing for "mandamus to compel an officer or employee of the United States"); see also United States v. Denedo, 556 U.S. 904, 912 (2009) (holding that the "authority to issue a writ under the All Writs Act [28 U.S.C. § 1651(a)] is not a font of jurisdiction").

[10] The Individual Defendants are also sued in their "official capacity" but, as Defendants correct note, any "official capacity" claim is just a redundant reassertion of Plaintiff's claims against Defendant CCPD.  [Doc. 56-1 at 15 n.9].

definition. They are not, and Plaintiff's FMLA claim against the Individual Defendants fails as a matter of law. <u>Wascura</u>, 169 F.3d at 687.

That leaves Plaintiff's claim against CCPD, which was Plaintiff's "employer" within the meaning of the FMLA. The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA's subchapter regarding leave requirements. 29 U.S.C. § 2615(a)(1)(2). In the absence of direct evidence, the Eleventh Circuit applies the <u>McDonnell Douglas</u>[11] framework for "evaluating a claim of retaliation under the FMLA." <u>Brungart v. BellSouth Telecommunications, Inc.</u>, 231 F.3d 791, 798 (11th Cir. 2000). A prima facie case of FMLA retaliation requires a plaintiff to "show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." <u>Brungart</u>, 231 F.3d at 798. The first element is met: Requesting FMLA leave is a protected activity under the FMLA. <u>See Pereda v. Brookdale Senior Living Communities, Inc.</u>, 666 F.3d 1269, 1276 (11th Cir. 2012). Plaintiff, however, cannot satisfy either of the other two elements.

First, Plaintiff contends that he can show a causal connection because of an "ongoing refusal to provide Plaintiff with workload relief and assistance." [Doc. 61 at

---

[11] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

13].[12]  But Plaintiff fails to explain how that has any connection to his FMLA leave. Plaintiff began complaining about "his caseload and made requests to lighten his workload" in 2016.  [Doc. 56-13 ¶15].  Thus, Plaintiff is contending that Defendants' "ongoing refusal" to provide him "workload relief" beginning in 2016 was somehow caused by Plaintiff's August 2019 request for FMLA leave.  See [Doc. 56-13 ¶45]. There is no causal connection when the "alleged retaliatory acts . . . began to occur . . . well before" the plaintiff's protected activity.  Manley v. DeKalb Cnty., Georgia, 587 F. App'x 507, 513 (11th Cir. 2014); see also Debe v. State Farm Mut. Auto. Ins. Co., 860 F. App'x 637, 640 (11th Cir. 2021) (holding that "if the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected" (emphasis in original)).

Plaintiff next notes that the IA investigation began right after he went on FMLA leave.  [Doc. 61 at 13].  But temporal proximity only matters if Plaintiff can "show that

---

[12] Plaintiff primarily makes general citations to his affidavit to support his arguments.  See [Doc. 61 at 13–14].  Even if the Court considered Plaintiff's facts, they are unavailing.  He asserts that two other employees were provided with case relief, however, this assertion is irrelevant because there is no evidence as to whether those employees took FMLA leave.  See [id. at 13].  Plaintiff also complains about being contacted while on leave, which might be relevant to an FMLA interference claim, but Plaintiff did not assert one.  See [id. at 10–15] (argument addressing Plaintiff's claim for "FMLA Retaliation"); see also [Doc. 6 ¶¶55–69] (Plaintiff's "FMLA Retaliation" count).  In any event, as discussed above, the Court will not consider "facts" that are based only on a vague citation to an affidavit.

the [persons] who took the adverse action [were] aware of [Plaintiff's] protected expression." Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997). Defendants Owensby and Ibarrondo decided to initiate the IA investigation ([Doc. 56-13 ¶39]), and Plaintiff has no evidence they knew of his FMLA leave at the time. [Id. ¶49]. Absent evidence they knew of protected activity, Plaintiff cannot establish a causal connection. See Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156 (11th Cir. 2002).

Even if Defendants knew of Plaintiff's FMLA leave when they began the IA investigation, the "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520 (11th Cir. 2007). An employee's misconduct can break the "causal chain" and sever any inference that might be raised by temporal proximity standing alone. Id. at 520–21. As will be discussed more below, the unrebutted evidence is that the IA investigation began because Plaintiff dumped over 50 new cases on his supervisor in a span of just 11 days—not because he took FMLA leave. See [Doc. 56-13 ¶¶35, 38, 42]. But these arguments put the cart before the horse because Plaintiff must show a "materially adverse" action before he can show a causal connection between his

protected activity and that action.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

As Plaintiff admits, he resigned.  [Doc. 61 at 13].  He contends "a root cause" of his resignation was the "workplace stress" caused by his caseload, but as discussed above that "stress" was present the entire time Plaintiff worked as a detective.  See [id.].  Plaintiff is simply contending that the job itself was difficult and that Defendants failed to provide workload relief from 2016 onward for reasons unrelated to Plaintiff's August 2019 FMLA leave.  Those are the kind of general workplace grievances "that often take place at work and that all employees experience," which cannot support an FMLA retaliation claim.  See Burlington, 548 U.S. at 68.

Otherwise, Plaintiff points to the "bogus investigation with no real evidence of wrongdoing," as the allegedly adverse action.  [Doc. 61 at 13].  As discussed below, Plaintiff's argument misses the mark.  But for present purposes, the point is that the IA investigation was not a materially adverse action since Plaintiff does not present evidence showing "it negatively impacted [him] in a material way."  See Perry v. Rogers, 627 F. App'x 823, 832 (11th Cir. 2015); see also Harris v. Fla. Agency for Health Care Admin., 611 F. App'x 949, 952 (11th Cir. 2015) ("A supervisor's statement that the plaintiff failed to perform his job duties sufficiently does not

constitute an adverse employment action when nothing in the memorandum indicates that the plaintiff was disciplined.").

Even if Plaintiff could make out a prima facie case of FMLA retaliation, he cannot rebut Defendants' legitimate, non-retaliatory reason for the IA investigation. As noted above, Plaintiff emailed over 50 new cases to his supervisor in a span of just 11 days.  See [Doc. 56-13 ¶¶35, 38].  Defendant Owensby's unrebutted testimony is that "it was unusual to receive such a large number of incident reports at a single time," which led him to believe "the incident reports did not all come in on the dates" Plaintiff put and that the "files had not been properly investigated."  [Id. ¶42].  That is the kind of legitimate, non-retaliatory reason "that might motivate a reasonable employer" to initiate an IA investigation.  See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  Thus, the burden shifts to Plaintiff to show the reason was merely a pretext for a retaliatory intent.  Id. at 1024.  That requires him to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[ ] for its action that a reasonable factfinder could find them unworthy of credence."  McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir.2004)); Combs v. Plantation Patterns, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997).

It is important to bear in mind that Plaintiff is not complaining about being disciplined for misconduct. The IA investigation was closed without any disposition because Plaintiff resigned. [Doc. 57-1 at 580]. Instead, Plaintiff is complaining about Defendants simply *opening* the IA investigation. As noted above, that is not a materially adverse action, but even if it were, Plaintiff would have to show Defendants' reason for *initiating* the investigation is "unworthy of credence." See McCann, 526 F.3d at 1375. Plaintiff does not try to do that and instead tries to rewrite Defendants' reason. [Doc. 61 at 14–15]. He claims Defendants investigated him because he did not "complete 200 cases within a matter of days," but does not cite anything in support of that position. [Id. at 14]. There is no evidence anywhere in the record suggesting that Defendants expected Plaintiff "to complete" cases "within a matter of days," or that they expected him "to complete 200 cases" in that timeframe.

The IA investigation began because Plaintiff filed over 50 incident reports in less than two weeks. [Doc. 56-13 ¶¶35, 38]. Defendant Owensby did not say he expected Plaintiff "to complete" those cases "within a matter of days"; he said that it "it was unusual to receive such a large number of incident reports at a single time." [Id. ¶42]. Defendants Owensby and Ibarrondo wanted "to determine when the tips came in and how long it took Plaintiff to review and submit incident reports." See [id. ¶¶42–43]. Plaintiff freely admits that he "had never sent such a large number of incident reports"

to Defendant Owensby in such a short time, bolstering Defendant Owensby's suspicion that something "unusual" was afoot.  [Id. ¶41].  Plaintiff does not offer anything to rebut Defendants' reasoning and instead tries, without any evidence, to rewrite history by claiming Defendants wanted "him to complete 200 cases within a matter of days." See [Doc. 61 at 14].

Plaintiff tries to show pretext by talking about the "stress and anxiet [*sic*]" Defendants caused by not providing him with "workload relief" and contacting him during his leave.  See [id.].  But those are simply Plaintiff's complaints, they have nothing to do with Defendants' reason for initiating the IA investigation.  Plaintiff must meet Defendants' "reason head on and rebut it."  Chapman, 229 F.3d at 1030.  The Court is not "a super-personnel department" here to adjudicate Plaintiff's years-old complaints about workload relief.  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir.1988)).

Even if Plaintiff had a good reason for opening 50+ cases in less than two weeks, that does not mean Defendants' reason for *investigating* the "unusual" incident is pretextual.  See [Doc. 56-13 ¶¶41–43].  At the end of their investigation, Defendants might have agreed with Plaintiff that he "properly investigated" the cases in question. See [id.].  We will never know because Plaintiff resigned before the investigation was

over, meaning there was no determination one way or the other.  [Doc. 57-1 at 580].

The fact that there were no "corrections or changes made to the questioned cases" is irrelevant because, again, no one ever decided there needed to be any "corrections or changes."  See [Doc. 61 at 14].[13]  Even if the IA investigation were a materially adverse action, which it was not, Plaintiff cannot show the kind of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[ ]" for initiating the investigation that would be needed to show pretext.  See McCann, 526 F.3d at 1375.  For all the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's FMLA Retaliation claim.

---

[13] Similarly, Plaintiff claims no one else handled his cases for him while he "was on leave or even 30 days thereafter," which is (1) unsupported by any admissible evidence and (2) irrelevant.  See [Doc. 61 at 14].  First, Plaintiff makes a general citation to his affidavit, which is both improper and means this "fact" lacks admissible evidence because Plaintiff has no personal knowledge of what happened after he resigned.  See [id.].  Second, the fact that no one did Plaintiff's work for him at that time is irrelevant because there was no determination that the cases needed to be completed "within a matter of days" like Plaintiff appears to claim.  See [id.].

## II.   <u>Plaintiff's Constitutional Claims</u>[14]

Plaintiff asserts that "his [§] 1983 procedural due process claim is proper" because Defendant "deprived him of his liberty interest in his reputation without the opportunity for a name-clearing hearing." [Doc. 61 at 28]. In support of that position, Plaintiff cites <u>Cotton v. Jackson</u>, 216 F.3d 1328 (11th Cir. 2000). [Doc. 61 at 27–28]. But that case says that "damage to reputation, standing alone, does not provide a basis for an action under 42 U.S.C. § 1983" and that a plaintiff must show "reputational damage [that was] sustained **in connection with a termination of employment.**" <u>Cotton</u>, 216 F.3d at 1330 (emphasis added).

Plaintiff ignores this bolded part of his own case and tries to assert due process claims based only on "injuries to his reputation." [Doc. 61 at 28]. Plaintiff "admits that he was not terminated," but then turns around and argues that he has a § 1983 claim based solely on allegedly "false and misleading" statements. [Doc. 61 at 29]. Plaintiff fails to cite any authority in support of that argument. <u>See</u> [<u>id.</u>].[15] Plaintiff's allegations

---

[14] Plaintiff contends Defendants actions violated both "the Georgia Constitution and [the] U.S. Constitution." [Doc. 6 ¶¶125–62]. To the extent Counts Six and Seven assert claims arising under Georgia law, those portions of these Counts fall under Section III: Plaintiff's State Law Claims.

[15] In the next sentence, Plaintiff cites <u>Munoz v. Selig Enters., Inc.</u>, 981 F.3d 1265 (11th Cir. 2020). [Doc. 61 at 29]. It is unclear how Plaintiff believes <u>Munoz</u> supports

sound in state tort law, and the fact that the statements were made "by an officer of the State" does not transform them into a Due Process violation.  Paul v. Davis, 424 U.S. 693, 711–12 (1976).  Defendants' allegedly libelous statements, "however seriously they may have harmed [the plaintiff's] reputation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause."  Id. at 712.

Plaintiff's other § 1983 claim fairs no better.  Plaintiff asserts Defendants violated his First Amendment rights by retaliating against him for speaking "as a concerned citizen."  [Doc. 61 at 30].  Such a claim suffers a host of problems.  First and without citing any evidence, Plaintiff asserts that his speech "*occurred in June, July and August 2019.*"  [Doc. 61 at 31] (emphasis in original).  Plaintiff began complaining about his workload in 2016.  [Doc. 56-13 ¶15].  The gulf of time between Plaintiff's alleged protected speech and the IA file defeats any inference that Defendants' conduct was "retaliation" for Plaintiff's speech.  More to the point though, Plaintiff's assertion that his statements were made "as a concerned citizen" is incorrect.  Plaintiff never contends that he spoke out to members of the public about what was happening.  See [Doc. 61 at 29–32].  Instead, Plaintiff complained to his employer during work hours about his workload as an employee.  [Doc. 56-13 ¶16].

---

his position, since it does not have anything to do with due process claims or § 1983. See Munoz, 981 F.3d at 1265–99.

Plaintiff asserts his complaints go to a "matter of public concern." [Doc. 61 at 30]. But "a public employee cannot meet the threshold for proving a First Amendment violation merely by showing that the speech at issue addressed a subject of public concern." Moss v. City of Pembroke Pines, 782 F.3d 613, 618 (11th Cir. 2015). Instead, Plaintiff's argument hinges on his assertion that complaining about his "workload assignments go[es] beyond his official duties." See [Doc. 61 at 30]. But Plaintiff fails to cite any factual evidence showing what is or is not part of "his official duties." See [id.]. Even if there were evidence to support Plaintiff's position, it misses the mark because the Court does not look to "rigid descriptions of official duties." Abdur-Rahman v. Walker, 567 F.3d 1278, 1284 (11th Cir. 2009). That is, it does not matter "whether an employee's job mandated the act of speaking." Id.

Plaintiff "voiced concerns about his caseload and made requests to lighten his workload." [Doc. 56-13 ¶15]. That speech "owes its existence to [plaintiff's] professional responsibilities" because Plaintiff was complaining about those same professional responsibilities. See Abdur-Rahman, 567 F.3d at 1283 (quoting Garcetti v. Ceballos, 547 U.S. 410, 421–22 (2006)). That kind of speech is not protected because "there is no relevant analogue to speech by citizens who are not government employees." Garcetti, 547 U.S. at 424. Citizens do not have a caseload, and thus have no reason to complain about it or to make "requests to lighten [their] workload." See

[Doc. 56-13 ¶15]. Only employees have a government-assigned workload, and Plaintiff's requests for assistance were "for the purpose of fulfilling [his] assigned job duties." See Abdur-Rahman, 567 F.3d at 1283.

Plaintiff argues this case is "very similar" to Echols v. Lawton, 913 F.3d 1313 (11th Cir. 2019). [Doc. 61 at 31–32]. But Plaintiff ignores some crucial distinctions between this case and Echols. The plaintiff in Echols was not a government employee complaining about his work assignments. See 913 F.3d at 1313–27. Therefore, Echols did not involve a workplace investigation by an employer into whether an employee properly performed his job duties. See id. For those reasons, Plaintiff's reliance on the Echols case is misplaced. Plaintiff wants "constitutional protection for any statement [he was] not required to make, even if it owed its existence to the performance of [his] official responsibilities, so [he] can expand that protection beyond citizen speech." Abdur-Rahman, 567 F.3d at 1286. But the Court "cannot focus exclusively on whether [Plaintiff was] required to speak," and he "cannot separate the statements [he] made from [his] official responsibilities to which those expressions were related." Id. Even if Plaintiff had properly asserted a First Amendment claim,[16]

---

[16] As Defendants correctly note, Plaintiff never asserted a proper First Amendment claim. See [Doc. 62 at 14]. Instead, the Second Amended Complaint contains a "Substantive Due Process" count. See [Doc. 6 ¶¶144–61]. "Supreme Court precedent demonstrates that an employee . . . is protected only by the procedural component of the Due Process Clause, not its substantive component." McKinney v.

it would fail as a matter of law.  For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's § 1983 claims.

## III.   **Plaintiff's State Law Claims**

The other claims in Plaintiff's Second Amended Complaint arise under Georgia State law, and as such the Court has only supplemental jurisdiction over those claims. See [Doc. 6 ¶¶70–124].  Because the Court recommends granting summary judgment on all Plaintiff's federal claims, the Court should, in its discretion, decline supplemental jurisdiction over Plaintiff's State law claims.  See 28 U.S.C. § 1367(c)(3) (providing that a court "may decline to exercise supplemental jurisdiction over a claim" if the "court has dismissed all claims over which it has original jurisdiction").

The considerations guiding a decision to exercise supplemental jurisdiction include judicial economy, convenience, fairness, and comity.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).  The Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."  Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir.

---

Pate, 20 F.3d 1550, 1560 (11th Cir. 1994); see also Echols, 913 F.3d at 1319 (11th Cir. 2019) (holding that "substantive due process cannot be used to govern a claim that is otherwise covered by the specific text of the First Amendment").

2004).  This is not the "unusual case in which [the Court] should exercise supplemental jurisdiction after all federal claims [are] dismissed."  See Silas v. Sheriff of Broward Cnty., Fla., 55 F.4th 863, 867 (11th Cir. 2022).  Accordingly, the undersigned therefore **RECOMMENDS** that the State law claims be **REMANDED** and that the Motion for Summary Judgment be **DENIED as moot** with respect to those claims.

## CONCLUSION

For the reasons explained above, Plaintiff's Motion for Leave to Cure ([Doc. 64]) is **GRANTED in part and DENIED in part**, and the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment ([Doc. 56]) be **GRANTED in part and DENIED in part**.  Specifically, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment ([Doc. 56]) be **GRANTED** as to Plaintiff's FMLA Retaliation claim and his § 1983 claims.  If those federal claims are dismissed, the undersigned **RECOMMENDS** that Plaintiff's State law claims be **REMANDED** to Clayton County Superior Court and that the Motion for Summary Judgment be **DENIED as moot** with respect to those claims.  See Silas, 55 F.4th at 867 (affirming the trial court's decision to remand remaining state law claims "after all federal claims were dismissed").  As this is a final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED, REPORTED AND RECOMMENDED**, this ___1___ day of

February, 2023.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE